UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

TIMOTHY L. BLIXSETH,

    Plaintiff,

vs.

INTERNAL REVENUE SERVICE; et al.,

    Defendants.

Case No. 3:20-cv-00101-RCJ-WGC

**ORDER**

In the First Amended Complaint (the operative complaint), Plaintiff brings this case against Lanny Breuer (who at times relevant to the case "was appointed the number-two person at the [Department of Justice (DOJ)], as Assistant Attorney General in charge of the Criminal Division"), seven federal agencies (United States Internal Revenue Service (IRS), the United States Department of Treasury, the Treasury Inspector General for Tax Administration, the United States Commissioner of Internal Revenue, the DOJ, the United States Federal Bureau of Investigations (FBI), and United States Immigration and Customs Enforcement Agency (ICE)) ("the Agency Defendants"), and Doe Defendants 1–100. (ECF No. 3.) Plaintiff raises ten "legal claims":

- Count One: Illegal Interference in Federal Tax Administration, in Violation of 26 U.S.C. § 7217 Pursuant to a Conspiracy to Violate Plaintiff's Civil Rights in Violation of 42 U.S.C. §§ 1983–1985.

- Count Two: Illegal Assessment of Federal Taxes Based on a Conspiracy Pursuant to 18 U.S.C. §§ 1962 (d) and 1964.
- Count Three: Illegal Interference in the Administration of Federal Taxes by Means of Violations of the Computer and Wireless Communications Crimes Statutes.
- Count Four: Illegal Interference in the Administration of Taxes by Means of Criminal Violations of 50 U.S.C. § 1810 et seq.
- Count Five: Illegal Interference in the Administration of Taxes by Means of Violations of the Privacy Act.
- Count Six: Illegal Interference in the Administration of Taxes by Means of Tortious Interference with Contract.
- Count Seven: Illegal Interference with the Administration of Federal Taxes Based on Fraud.
- Count Eight: Intentional Infliction of Emotional Distress.
- Count Nine: Count Nine: Illegal Interference in the Administration of Taxes Based on Breaches of Duties of Care, in Violation of 26 U.S.C. §§ 6103, 7217, 7431; and IRS Manual 9.5.11.2.4.
- Count Ten: Abuse of Process and Malicious Prosecution.

The United States substituted itself for Defendant Breuer for Counts Six, Seven, Eight, Nine, and Ten. (ECF No. 32.)

There are three fully briefed motions to dismiss seeking the dismissal of the case in its entirety for all Defendants, which are ripe for this Court to review. During the pendency of these motions, Plaintiff has filed motion seeking leave to file a proposed Second Amended Complaint, which he attached to the motion. This complaint limits the defendants to the United States, Lanny Breuer, Albert Stieglitz, and Doe Defendants 1–100. Plaintiff modified the "legal claims" slightly as follows:

- Count One: Conspiracy to Violate Plaintiff's Civil Rights.
- Count Two: Illegal Assessment of Federal Taxes Based on a Conspiracy Pursuant to 18 U.S.C. §§ 1962 (d) and 1964.
- Count Three: Violations of the Privacy Act.
- Count Four: Tortious Interference with Contract / Interference with Prospective Business Advantage / Interference with Prospective Economic Opportunity.
- Count Five: Fraud / Fraudulent and Illegal Interference with the Administration of Taxes.
- Count Six: Intentional Infliction of Emotional Distress.
- Count Seven: Illegal Interference in the Administration of Taxes Based on Breaches of Duties of Care, in Violation of 26 U.S.C. §§ 6103, 7217, 7431; and IRS Manual 9.5.11.2.4.
- Count Eight: Abuse of Process / Malicious Prosecution.
- Count Nine: Civil Conspiracy.

Defendants oppose this motion for leave to amend, claiming that such amendment is futile as it fails to address all the argues that they raise in their motions to dismiss.

The Court finds that dismissal as Plaintiff's claims are untimely, and amendment cannot cure this defect. The Court therefore grants the motions to dismiss and denies Plaintiff's motion for leave to amend his complaint.[1]

**FACTUAL BACKGROUND**

Plaintiff alleges the following in the seventy-three-page First Amended Complaint (ECF No. 3): In 1998, Plaintiff founded a private ski resort called the Yellowstone Club in Montana. (*Id.* ¶ 11.) He was the sole owner of company, Blixseth Group, Inc. (BGI), which owned 100% of the voting stock of the club. (*Id.* ¶ 68.)

In 2008, Plaintiff's then-wife, Edra, began divorce proceedings against Plaintiff. (*Id.* ¶ 16.) She and a group of private and state actors formed a conspiracy to deprive Plaintiff of his stake in the Yellowstone Club by forcing Plaintiff into an involuntary bankruptcy. (*See, e.g.*, *Id.* ¶ 17.) This initial conspiracy included Mike Meldman, financier Samuel Byrne, former Montana Attorney General Steve Bullock, former Montana Governor Brian Schweitzer, Schweitzer's campaign donor Ron Burkle, Credit Suisse, and Edra. (*Id.* ¶¶ 14, 16.) The private actors sought, and ultimately succeeded, to profit by acquiring the club for a fraction of its worth, and then would kickback financial donations to Schweitzer's gubernatorial campaign. (*See, e.g.*, *Id.* ¶¶ 32, 45 at 8:9–10.)[2]

---

[1] Agency Defendants also filed a Motion for Leave to File Excess Pages (ECF No. 28), requesting that this Court allow them to file their Motion to Dismiss (ECF No. 30) in excess of twenty-four pages. Motions to dismiss are limited to twenty-four pages unless this Court finds good cause to extend that limit. LR 7-3. Defendants point to the length of the complaint, number of the parties, number of claims, and the amount in controversy. Based on these considerations, the Court finds good cause and grants this motion.

[2] The Court cites to page and line numbers for some paragraphs as many of the paragraphs span several pages. Paragraph 45, for example, spans more than six.

To execute this plan, Edra obtained the club under a Marital Settlement Agreement (MSA) with Plaintiff. (*Id.* ¶ 45 at 8:4–5.) The conspirators then used a series of loans to force the club into a bankruptcy, which allowed the private actors to purchase the club for approximately $100,000,000 despite its true value being approximately $1,000,000,000. (*Id.* ¶¶ 22–24, 32.) Schweitzer used his political influence in Montana to pressure the federal bankruptcy judge into issuing orders that benefited the conspirators over Plaintiff. (*See, e.g.*, *Id.* ¶ 140 ("During the bankruptcy proceedings, Edra wrote to her lawyer Dennis Holahan: 'SB (Byrne) and BS (Schweitzer) have spent enormous political capital and political favors to ensure they get the right outcome from the Montana bankruptcy judge.'").)

In April 2009, Defendant Breuer, who was Burkle's friend, became Assistant Attorney General for the Department of Justice (DOJ) Criminal Division. (*Id.* ¶¶ 45 at 9:1–2, 325.) Defendant Breuer and a largely unidentified group of "members of his executive branch team and associates (hereinafter the 'Breuer Team'), . . . used the IRS and the FBI to illegally target Plaintiff." (*Id.* ¶ 42.)

In May 2010, Defendant Breuer instructed DOJ attorney Albert Stieglitz to investigate Plaintiff to determine whether Plaintiff bribed the Premier of Turks and Caicos, a British protectorate, in violation of the Foreign Corrupt Practices Act. (*Id.* ¶ 189.) Defendant Breuer also contacted UK government officials to conduct a similar investigation. (*Id.* ¶ 190.) Both of these investigations were pursued without probable cause. (*Id.*)

Plaintiff claims these investigations were "witch hunts" and were part of the conspiracy to deprive him of the Yellowstone Club. Defendant Breuer was attempting to make Plaintiff drop his legal defenses in the Montana bankruptcy proceedings. (*Id.* ¶ 192.) For example, on August 10, 2010, Defendant Breuer directed the U.S. Coast Guard to stop Plaintiff's boat in California and to detain it for more than two weeks. (*Id.* ¶ 45 at 10:4–8.) At the time, the boat was on a short-term

lease, and Defendant Breuer detained the boat because he knew that Plaintiff needed the funds from the lease. (*Id.*) Defendant Breuer knew this information because he was tapping into Plaintiff's phone and hacking into his computer. (*Id.*)

On August 29, 2010, Byrne's and Burkle's counsel in the Montana bankruptcy proceeding emailed Plaintiff's attorney. (*Id.* ¶ 199.) The email stated, "Thought you might enjoy this," and included a link to a YouTube video of aircraft carriers. (*Id.*) This "convey[ed] the message that the entire U.S. Government was on their side and that Plaintiff's fight for justice and his intended appeals were useless." (*Id.*)

Defendant Breuer's campaign of antagonizing Plaintiff continued and included several searches without probable cause. In November 2010, ICE agents stopped Plaintiff's airplane in Las Vegas, Nevada. (*Id.* ¶ 45 at 10:23–24.) The Director of ICE, John Morton, "received instructions from Breuer, circumventing and violating the ICE guidelines and protocols, to stop and detain Plaintiff's airplane . . . [in] Las Vegas, Nevada." (*Id.* ¶ 63.)

In or around early 2010, the IRS completed an audit of a 2005 loan transaction involving Plaintiff: Credit Suisse made a $375,000,000 loan to the Yellowstone Club; Plaintiff caused the Yellowstone Club to loan $209,000,000 to BGI, as certain provisions of the loan agreement with Credit Suisse contemplated; and Plaintiff caused BGI to "pass through" the $209 million to him. (*Id.* ¶ 95.) On January 4, 2010, the IRS issued a "No Change" decision, which found that the transaction was properly characterized as a loan rather than a shareholder distribution for tax purposes. (*Id.* ¶¶ 178–79.) But then, in October 2010, the "Breuer Team" got the IRS to reopen the audit in violation of its regulations. (*Id.*) Then in March 2011, the Montana Department of Revenue

///

///

///

and the IRS issued "contrived" tax assessments for $80,000,000. (*Id.* ¶ 45 at 11:1–8.)[3] On April 5, 2011, state tax authorities "filed the involuntary bankruptcy against Plaintiff in the Las Vegas, Nevada, Bankruptcy Court." (*Id.* ¶ 218.) This proceeding was dismissed because the judge was "impartial" and "immediately recognized it as a bad-faith attempt to use a bankruptcy trustee appointed as part of the involuntary bankruptcy to deprive Plaintiff of his appellate and due process rights in Montana, and to take control of Plaintiff's money and assets in order to strip him of money to defend himself in the Montana bankruptcy conspiracy." (*Id.*)

From 2006 to June 2012, "Edra employed U.S. Government and CIA computer expert and consultant Dennis Montgomery to hack into Plaintiff's and his attorney's computers in order to intercept their privileged communications and strategies and to acquire information and data on Plaintiff's business and personal life." (*Id.* ¶ 45 at 7:19–22.) Defendants relied on these intercepted emails to stop Plaintiff's boat and plane. (*Id.* ¶ 55(a).) In April 2015, the Foreign Intelligence Surveillance Court granted Montgomery immunity, and that court granted his request. (*Id.* ¶ 258.) Montgomery turned over the hard drives to the federal government, and the emails intercepted from Plaintiff are now classified. (*Id.*) In April 2017, Montgomery had discussions with Plaintiff's representatives, where he stated that he and the DOJ hacked into Plaintiff's emails with counsel; the FBI, "under Breuer's direction," had monitored his phone calls; and Breuer was responsible for ending the Montana federal task force's investigation. (*Id.* ¶ 251.)

In 2010, the Montana bankruptcy court entered judgment against Plaintiff for over $40,000,000, which later increased to over $286,000,000. *See In re Yellowstone Mtn. Club*, 2010 WL 3504210 (Bankr. D. Mont. 2010) and 2012 WL 6043282 (Bankr. D. Mont. 2012). This aspect

---

[3] The Ninth Circuit later ruled that this "loan" from his company was fraudulent: "Blixseth defrauded the Club entities and their minority members, massively enriching himself; breached fiduciary duties; and then constructed barriers to recovery of his ill-gotten gains by the subsequent fraudulent transfer in the MSA releases." *Blixseth v. Glasser (In re Yellowstone Mt. Club, LLC)*, 656 Fed. Appx. 307, 311 (9th Cir. 2016).

of the judgment was affirmed by the Ninth Circuit in 2016. *In re Yellowstone Mountain Club, LLC*, 656 Fed. App'x 307 (9th Cir. 2016). In that case the circuit noted that "[t]he lenders may have been reckless in issuing their loans, but such wrongdoing is not comparable in degree or kind to [Plaintiff]'s wrongdoing." *Id.* at 311.

In the complaint, Plaintiff makes several allegations stating that he only recently learned of the facts that he alleges in his complaint. For example, he includes statements such as: "Through diligent discovery and numerous hard-fought FOIA requests, Plaintiff has been slowly obtaining proof and learning of the far-reaching conspiracy against him." (ECF No. 3 at 13.) And "Plaintiff has recently learned that on seven different occasions, the DOJ sought surveillance permission of Plaintiff's communications." (*Id.* ¶ 191.) In his briefs opposing dismissal, he states that the DOJ only recently produced some information in December 2019, in *Blixseth v. United States*, Case No. 18-cv-02281 (D.D.C.), including a document titled a "Vaughn Index." (*See, e.g.*, ECF No. 39 at 11.) He claims that this document "shows several communications with unnamed members of the IRS, FBI, DOJ, and other agencies, as well as instances where the authors and recipients are entirely blank, which would likely indicate non-federal actors. It also reveals multiple requests and uses of a 'specific investigative tool' against Plaintiff." (*Id.* at 11–12.)

In 2016, Plaintiff's previous counsel, Summer Shaw, made a FOIA request for records of Defendant Breuer's alleged misconduct. *See Shaw v. United States Dep't of Justice*, No. CV 18-593 (JEB), 2019 WL 6135679, at *1 (D.D.C. Nov. 19, 2019). In this case, Plaintiff swore in affidavit that Montgomery told him about key events that he alleges in this lawsuit in 2014. *Shaw*, ECF No. 32-1 ("2019 Declaration"), ¶¶ 13-17. For example, Plaintiff swore that he learned about a conspiracy that involved "three former top DOJ (main branch) officials" and Defendant Lanny Breuer along with Burkle and his ex-wife. *Id.* at 15.

///

Plaintiff is now seeking damages against Defendants for unlawfully investigating him, without factual basis, for bribing the Premier of Turks and Caicos; illegally seizing his boat and plane without probable cause; reopening the BGI "loan" audit, without following proper procedures; and gaining unauthorized access to his computer to seize his emails in violation of federal surveillance and computer fraud laws.

## LEGAL STANDARD

### I. Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted. When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). The court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts pertaining to his own case making a violation "plausible," not just "possible." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009) (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."). That is, a plaintiff must not only specify or imply a cognizable legal theory, but also must allege the facts of the plaintiff's case so that the court can determine whether the plaintiff has any basis for relief under the legal theory the plaintiff has specified or implied, assuming the facts are as the plaintiff alleges (*Twombly-Iqbal* review).

If the court grants a motion to dismiss a complaint, it must then decide whether to grant leave to amend. The court should "freely give" leave to amend when there is no "undue delay, bad faith or dilatory motive on the part of the movant . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962). Generally, leave to amend is denied only when it is clear that the deficiencies of the complaint cannot be cured by amendment. *See DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

A plaintiff must timely exhaust any administrative remedies before bringing a Title VII claim to court. *Lyons v. England*, 307 F.3d 1092, 1103-04 (9th Cir. 2002). However, failure to exhaust non-judicial remedies is generally treated as an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 212 (2007). The court should not dismiss a case based on an affirmative defense unless the elements of the defense appear on the face of the pleading to be dismissed. *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013). Where an affirmative defense is not clear from the face of the complaint sought to be dismissed, it cannot be determined until (at least) the summary judgment stage; it cannot be treated as a quasi-summary-judgment matter under Rule 12(b). *Albino v. Baca*, 747 F.3d 1162, 1168–69 (9th Cir. 2014) (en banc) (overruling *Wyatt v. Terhune*, 315 F.3d 1108 (9th Cir. 2003)).

///

///

## II. Leave to Amend

Fed. R. Civ. P. 15(a) provides that a plaintiff may amend its pleading with leave of court and that courts "should freely give leave when justice so requires." The Ninth Circuit applies this standard with "extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001). As such, courts may only deny a motion for leave to amend "if there is strong evidence of 'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc.'" *Sonoma Cty. Ass'n of Retired Employees v. Sonoma Cty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (alteration in original). A finding of "futility of amendment alone can justify the denial of a motion" to amend. *Ahlmeyer v. Nev. Sys. Of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir. 2009). Amendment is futile if the proposed complaint is "subject to dismissal." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538 (9th Cir. 1989).

## ANALYSIS

Defendants argue that the entirety of the First Amended Complaint and the Proposed Second Amended Complaint would be subject to dismissal. The Court agrees. The Court finds that the claims are untimely and cannot be remedied through amendment. As such, the Court dismisses this case with prejudice.

Plaintiff's claims must be dismissed as untimely. These claims are based on events that primarily occurred in 2008–2013, and Plaintiff first initiated this case in February 2020. Defendants argue that all of Plaintiff's claims are barred by the applicable statutes of limitations of two year for all claims except of the RICO claims which is four years. Plaintiff does not dispute these are the applicable statutes of limitations. (*See* ECF No. 47 at 4 ("[Plaintiff] does not dispute that the limitations period is four years for his RICO claim and two years for his other claims.").)

1  Plaintiff raises two arguments to claim that his causes of action are nonetheless timely: the
2  discovery rule and equitable tolling based on fraudulent concealment.
3      The discovery rule determines when a claim begins to accrue. "Accrual is the date on which
4  the statute of limitations begins to run; under federal law, a claim accrues 'when the plaintiff knows
5  or has reason to know of the injury which is the basis of the action.'" *Lukovsky v. City & Cty. of*
6  *San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008) (quoting *Olsen v. Idaho State Bd. of Med.*,
7  363 F.3d 916, 926 (9th Cir. 2004)). A statute of limitations begins to accrue when the plaintiff
8  learns of the "actual injury" and not necessarily that the injury constituted a "legal wrong." *Id.*
9  Once an injury has occurred, the burden is on the plaintiff to "ascertain the existence and source
10 of fault within the statutory period." *Davis v. United States*, 642 F.2d 328, 331 (9th Cir. 1981)
11 (citing *United States v. Kubrick*, 444 U.S. 111, 123 (1979)).
12     Applying this standard, in the Title VII context, for example, a plaintiff's claim begins to
13 accrue when he learns that he incurred an adverse employment decision even if he did not learn
14 that decision was based on illegal discriminatory intent until later. *Lukovsky*, 535 F.3d at 1050.
15 Also, in the context of a medical malpractice claim under Federal Tort Claims Act (FTCA), a claim
16 accrues when a plaintiff learns of his injury and its cause even if the plaintiff does begin to suspect
17 negligence until later. *Davis*, 642 F.2d at 331.
18     Similarly, Plaintiff largely learned of the actual injuries he premises this case upon in 2008–
19 2013, when they occurred, but claims that he did not learn details of the legal wrong until recently.
20 (*See* ECF No. 3 ¶ 251.) However, this is analogous to the Title VII example of *Lukovsky*. Plaintiff
21 alleges that he did not learn of the legal wrongs until recently, but regardless, he learned of the
22 actual injuries many years ago. As such, the discovery rule does not save Plaintiff's claims as
23 alleged that he learned about at the time. These claims would include all but potentially the claims
24 related to the surreptitious searches of his private communications and the conspiracy (assuming

that the discovery of a conspiracy goes towards learning of the "actual injury" as opposed to the "legal wrong").

Plaintiff admits in the First Amended Complaint that in 2017 Montgomery told Plaintiff's representatives that "he and the DOJ had been hacking into Plaintiff's and his counsel's emails throughout the divorce and the Yellowstone Club bankruptcy proceedings and providing the data to Edra; and that the FBI, under Breuer's direction, was wiretapping their phone calls on behalf of Edra and Burkle." (ECF No. 3 ¶ 251.) Because of this allegation, Plaintiff admits that he learned of all of his claims in this complaint in 2017 at the latest. The claims are thus untimely except for the RICO claims based on the alleged conspiracy between Defendant Breuer and others as this statute of limitations is four years.

In a prior affidavit, however, Plaintiff swore, that he was aware of a conspiracy involving Defendant Breuer and other members of the DOJ to interfere with Plaintiff's bankruptcy case in 2014. 2019 Declaration ¶¶ 13–17. The Court may consider the 2019 Declaration without converting this motion into one for summary judgment. *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record . . . , including documents on file in federal or state courts.") (citing Fed. R. Evid. 201) (considering a declaration filed in prior litigation for a motion on the pleadings). Based on this prior testimony, Plaintiff's conspiracy cannot be timely as he admitted that he has known of it since 2014.

Based on these facts, Plaintiff's argument for equitable tolling is equally unavailing. Plaintiff contends Defendants acted in a "covert way" and he was left in the dark so was unable to "know what was going on until enough puzzle pieces could be constructed." (ECF No. 37 at 5.) To survive a motion to dismiss on the basis of equitable tolling because of fraudulent concealment, a plaintiff "must plead with particularity the facts giving rise to the fraudulent concealment claim and must establish that [he] used due diligence in trying to uncover the facts." *Volk v. D.A.*

1 *Davidson & Co.*, 816 F.2d 1406, 1415–16 (9th Cir. 1987). A defendant's "silence or passive conduct does not constitute fraudulent concealment." *Id.* at 1416.

First, Plaintiff does not assert that Defendants performed any affirmative acts of fraud to prevent Plaintiff from knowing but merely passively withheld disclosure of facts to Plaintiff by stonewalling FOIA requests. This is not fraud. Second and more importantly, as discussed above, Plaintiff admits that he was aware of these claims for several years, and tolling cannot continue on this basis after a party becomes aware of the facts that give rise to his case. As such, Plaintiff's claim of equitable tolling fails.

As Plaintiff allegations show that he discovered his claims at the latest in 2017 and previously testified that he learned of the conspiracy claim in 2014, all of his claims untimely. The Court further finds that amendment cannot cure these defects. As such dismissal with prejudice is appropriate and amendment would be futile because it would necessitate contradicting his operative complaint and prior testimony.

///

///

///

///

///

///

///

///

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that Motion for Leave to File Excess Pages (ECF No. 28) is GRANTED.

IT IS FURTHER ORDERED that Motion to Dismiss (ECF No. 30) is GRANTED.

IT IS FURTHER ORDERED that Motion to Dismiss (ECF No. 34) is GRANTED.

IT IS FURTHER ORDERED that Motion to Dismiss (ECF No. 35) is GRANTED.

IT IS FURTHER ORDERED that Motion for Leave to Amended (ECF No. 55) is DENIED.

IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment and close the case.

IT IS SO ORDERED.

Dated February 11, 2021.

_____
ROBERT C. JONES
United States District Judge